Earl L. SHANK and Patricia Ann Shank, Individually, and Patricia Ann Shank, as Administratrix of the Estate of Sherry Lee Shank, Deceased

v.

AMERICAN MOTORS CORPORATION and Jeep Corporation

and

Donald Pusey.

Robert Timothy BENNER

v.

JEEP CORPORATION and American Motors Corporation.

Civ. A. Nos. 82–1794, 82–2486.

United States District Court, E.D. Pennsylvania.

Nov. 10, 1983.

---

**126**

Garland D. Cherry, Media, Pa., for Shank.

Robert E. Slota, Bryn Mawr, Pa., for Benner.

Joseph V. Pinto, Philadelphia, Pa., for American Motors & Jeep.

Harry A. Short, Philadelphia, Pa., for Donald Pusey.

Joseph V. Pinto, Philadelphia, Pa., for defendants.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

### I. Introduction

On June 17, 1980, Sherry Lee Shank died as a result of injuries sustained while a passenger in a 1978 Jeep CJ Renegade which rolled over in a single vehicle accident. On November 14, 1981, Robert Timothy Benner was rendered a paraplegic as a result of injuries sustained while a passenger in a 1975 Jeep CJ–5 which rolled over in a single vehicle accident. Plaintiffs in both the *Shank* and *Benner* cases thereafter instituted products liability actions against defendants American Motors Corporation and Jeep Corporation, alleging that the injuries were caused by the defective design, manufacture, and assembly of the subject jeeps. On June 7, 1983, defendants requested that I recuse myself on the ground that I am personally biased against car manufacturers, a class in which defendants are members. Defendants further allege that this bias was extrajudicially acquired. Defendants point to the following colloquy, which took place at a discovery conference in the *Shank* case on April 15, 1983, as providing a basis for their motion:

THE COURT: Very well. This is a suit to recover damages for alleged defects in a motor vehicle called a "Jeep" manufactured and sold by American Motors Company as I understand it.

In previous conferences I have encountered unwillingness to answer, evasiveness, chicanery, intentional misunderstanding of the questions that were asked and refusal to answer based on an alleged misunderstanding or non-knowledge of a question.

It now becomes perfectly obvious to me that the defendant did understand the question, could have understood the question, and could have answered the interrogatories.

It also becomes increasingly obvious to me that the defendant is attempting to hide information, conceal information, and evade answering interrogatories.

Therefore, I am ordering that all interrogatories that have been asked be answered insofar as they relate to the defect contained in the Complaint and not beyond the defect complained of in the Complaint.

Mr. Pinto has told me that this will put the American Motors Company out of business. Aside from the fact that I just simply don't believe that whatsoever, that's too bad. If it puts them out of business, maybe they deserve to be put out of business.

Is there anything else you want me to add to what I said before?

(pause)

MR. PINTO: Well, you might want to add your previous comments that "Automobile manufacturers are amongst the most devious groups of defendants that you have ever seen."

THE COURT: I certainly adopt that. "Automobile manufacturers are among the most devious groups of defendants that I have ever seen in 21 years on the Bench."

Also, I might add that in the case of at least one automobile manufacturer, it's the only case I can remember in which I entered a Default Judgment for evasiveness and failure to answer interrogatory questions, following which the case was settled for $500,000.

MR. PINTO: Well, we ought to make clear that that doesn't happen to be the defendant here.

THE COURT: It is not the defendant here. It's simply—

MR. PINTO: Although we are being found guilty by association.

THE COURT: No, it's simply in keeping with the assertion that you asked me to make: "That automobile manufacturers are the most devious group of defendants I have ever encountered."

On September 28, 1983 I denied the motion. This opinion explains why.

## II. Applicable Law

Defendants' recusal motion is made pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455. The former section provides:

Whenever a party to any proceeding in a district court makes and files a *timely and sufficient affidavit* that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The *affidavit shall state the facts and the reasons for the belief that bias or prejudice exists,* and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith. (Emphasis added).

28 U.S.C. § 455 reads in relevant part:

(a) Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

. . . . .

 The mere filing of an affidavit under § 144 does not automatically disqualify a judge from hearing a case. *United States v. Townsend,* 478 F.2d 1072, 1073 (3d Cir.1973). It is the duty of a judge to determine whether the affidavit is timely and legally sufficient. *Id.* The allegations

of bias or prejudice must set forth specific facts including time, place, persons and circumstances. *Id.* at 1074.

### A. Timeliness

 Defendants filed a joint recusal motion with respect to both the *Shank* and *Benner* cases. The motion and affidavit, however, were not timely. An affidavit is untimely when the party significantly invokes participation by the court in pretrial motions or other judicial proceedings between the time he first learned of the asserted prejudice and the time the § 144 motion was filed. *Smith v. Danyo,* 585 F.2d 83, 86 (3d Cir.1978); *Samuel v. University of Pittsburgh,* 395 F.Supp. 1275, 1279 (W.D.Pa.1975), *vacated on other grounds,* 538 F.2d 991 (3d Cir.1976). The affidavit asserts that defendants first became aware of my alleged prejudice at a hearing in the *Benner* case on December 9, 1982. Defendants' recusal motion, however, was not filed until June 7, 1983. In the intervening six month period, defendants in the *Benner* case (1) moved for a discovery conference; (2) moved to compel an inspection of the vehicle described in plaintiff's complaint and for a protective order to preclude discovery of information obtained as a result of such inspection; (3) filed a praecipe to withdraw a previous motion; (4) participated in a discovery conference; (5) filed an answer to plaintiff's amended complaint; (6) answered four motions or requests filed by plaintiff; (7) filed supplemental interrogatories; and, (8) filed three sets of answers and objections to plaintiff's interrogatories. In all, defend-

ants made sixteen filings in the *Benner* case between December 9, 1982, and June 7, 1983. There is no room for argument that defendants did not affirmatively invoke the participation of this court between the time they first learned of the alleged bias and the time they filed the § 144 motion.

In the same six month period in the *Shank* case,[1] defendants (1) participated in a pre-trial conference at which there was extensive discussion of the discovery problems encountered in the case; (2) moved to compel discovery; (3) submitted a stipulation providing defendants with an extension of time to respond to plaintiffs' motion to compel; (4) answered plaintiffs' motion to compel more sufficient answers to interrogatories; and (5) participated in a discovery conference scheduled by me to resolve plaintiffs' motion to compel. Thus, similar to the *Benner* case, defendants affirmatively invoked the participation of this court between the time they first learned of the alleged bias and the time they filed the § 144 motion. The motion is untimely in both cases.

### B. Extrajudicial Origin

Because defendants have also suggested that I recuse myself, *mea sponte,* under 28 U.S.C. § 455, I did not rely solely on the untimeliness of their § 144 affidavit.[2] This circuit has specifically held that only extrajudicial bias forms a basis for recusal under either § 144 or § 455. *Johnson v. Trueblood,* 629 F.2d 287, 290–91 (3d Cir.

---

**1.** Defendants argue that their § 144 affidavit is timely with respect to the *Shank* case because they did not substantially invoke the participation of this court after allegedly prejudicial remarks were made at a hearing in that case on April 15, 1983. The timeliness of a § 144 motion, however, turns on whether the affiant has invoked court participation between the time he *first learned* of the asserted bias and the time the motion was filed. *Smith v. Danyo, supra,* 585 F.2d at 86. As the affidavit states, the defendants first learned of the alleged bias at a hearing in the *Benner* case on December 9, 1982. The operative dates for measuring the timeliness issue are not altered by the fact that similar statements allegedly indicating bias

were later made on April 15, 1983. It is clear that statements thought to show bias made outside of the proceedings in which the movant is involved may serve as a basis for recusal. *See e.g., United States v. Dansker,* 537 F.2d 40, 53 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977); *United States v. Thompson,* 483 F.2d 527, 528 (3d Cir.1973).

**2.** Unlike § 144, § 455 does not contain any procedural requirements by which a litigant can assert that a judge should be disqualified. Section 455 is aimed directly at judges and requires voluntary disqualification when the requisite prejudice exists.

1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). Other circuits agree. *United States v. Cowden,* 545 F.2d 257, 265 (1st Cir.1976), *cert. denied,* 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977); *In re International Business Machines Corp.,* 618 F.2d 923, 928 (2d Cir. 1980); *Davis v. Board of School Commissioners,* 517 F.2d 1044, 1052 (5th Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *City of Cleveland v. Krupansky,* 619 F.2d 576, 578 (6th Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980); *United States v. Olander,* 584 F.2d 876, 882 (9th Cir.1978), *vacated on other grounds,* 443 U.S. 914, 99 S.Ct. 3104, 61 L.Ed.2d 878 (1979); *United States v. Haldeman,* 559 F.2d 31, 132 n. 297 (D.C. Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). The affidavit filed here fails to meet this requirement.

In evaluating the legal sufficiency of an affidavit, the court may not question either the truth of the allegations or the good faith of the pleader. *United States v. Townsend, supra,* 478 F.2d at 1073; *Resident Advisory Bd. v. Rizzo,* 510 F.Supp. 793, 797 (E.D.Pa.1981). The court, however, "does not need to consider the allegations that the judge has personal bias and prejudice as being factual allegations as these are only conclusory." *Action Realty Co. v. Will,* 427 F.2d 843, 844 (7th Cir. 1970). *Cf. United States v. Townsend, supra,* 478 F.2d at 1074. So here, the mere unsupported allegation of extrajudicial origin of the alleged bias is purely conclusory. There are no "[f]acts including time, place, persons, and circumstances," *United States v. Townsend, supra,* set forth which lend factual underpinnings to a conclusion that the charged bias was not judicially acquired.

Indeed, the very statement on which defendants rely shows on its face that its origin was judicial. "Automobile manufacturers are among the most devious groups of defendants I have ever seen in twenty-one years on the Bench." That statement itself shows that my feeling arose from my experience as a judge. And the very next sentence [3] shows affirmatively that the statement had a judicial origin.

A judicial attitude even though developed partly through previous experience on the bench, and not wholly as a result of participation in the instant case, cannot serve as a basis for recusal. As stated in *United States v. Sinclair,* 424 F.Supp. 715, 718 (D.Del.1976), *aff'd,* 566 F.2d 1171 (3d Cir.1977):

> [I]t is ... clear that a claim of bias or prejudice based on judicial knowledge gained from prior hearings or *other cases* is not sufficient grounds for disqualification of a judge whether it be from prior judicial exposure to the defendant or prior judicial rulings adverse to the defendant in the same or different cases (emphasis added).

Further, it has been stated that:

> A showing of prior judicial exposure to the *same* parties does not suffice to demonstrate personal bias.... It follows that a prior judicial exposure to the same type of case brought by the same law enforcement officers but involving different parties is an even less adequate basis to show personal bias (citation omitted).

*United States v. Jackson,* 627 F.2d 1198, 1207 n. 20 (D.C.Cir.1980).

Perhaps best summarizing the law on this point, it has been held that "a motion for disqualification ordinarily may not be predicated on the judge's rulings in the instant case or in related cases, nor on a demonstrated tendency to rule any particular way, nor on a particular judicial leaning or attitude derived from his experience on the bench." *Phillips v. Joint Legislative Comm.,* 637 F.2d 1014, 1020 (5th Cir.1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035,

---

**3.** "Also, I might add that in the case of at least one automobile manufacturer, it's the only case I can remember in which I entered a Default Judgment for evasiveness and failure to answer interrogatory questions ...."

72 L.Ed.2d 483 (1982); *United States v. Peltier,* 553 F.Supp. 886, 889 (D.N.D.1982).[4] The last statement in *Phillips* is precisely the situation here as revealed by the affidavit's own language.

Defendants' conduct in the present cases is typical of the type of conduct by automobile manufacturers which constitutes the basis of my judicially formed opinion.

### 1. Benner v. AMC and Jeep Corporation

This case has been stalled in the early stages of discovery since the complaint was filed in April, 1982. Plaintiff's first set of interrogatories were filed on June 29, 1982. Defendants' answers, which were not filed until October 20, 1982, after plaintiff had filed a motion to compel, were replete with objections on the grounds that the interrogatories were vague, irrelevant, overbroad, and unduly burdensome. Some answers, though not raising specific objections, were simply cavil. For example, plaintiffs' interrogatory No. 2 asking "how long has the defendant been manufacturing and selling the Jeep CJ–5 vehicle" met with the response that "defendant does not manufacture nor sell Jeep CJ–5 vehicles." This answer can charitably be described as disingenuous. Although technically correct—it was not American Motors Corporation, but rather its wholly owned subsidiary, Jeep Corporation, that manufactured and sold Jeep CJ–5's—it would be naive to believe that defendant did not understand or could not have more appropriately answered the question, especially since Jeep Corporation had been brought in as a defendant before the filing of the answers.[5]

### 2. Shank v. AMC and Jeep Corporation

Like *Benner v. AMC,* this case has been mired in the early stages of discovery since the complaint was filed in March, 1982. The frustration continues today. On July 2, 1982, plaintiffs sent their first set of interrogatories to defense counsel. After two requests for extension of time to answer, both of which were made late, were granted, defendants finally filed their answers on October 1, 1982. They objected to or allegedly found themselves unable to respond to approximately seventy percent of the interrogatories.

After a meeting between plaintiffs' and defendants' counsel on November 4, 1982 to resolve discovery differences proved unsuccessful, plaintiffs requested a discovery conference. A conference was then scheduled for December 3, 1982, but was later cancelled when defense counsel objected to plaintiffs' failure to state in writing exactly which interrogatories were in dispute. A pre-trial conference was then held on January 11, 1983 in which I was advised of the status of plaintiffs' interrogatories. I was also advised of defense counsel's desire to learn the identity of all experts who would be used by plaintiffs in the litigation.

As a result of the conference, I entered an order on January 14, 1983 requiring plaintiffs to identify all experts within thirty days and requiring plaintiffs to file any motion to compel answers to interrogatories within thirty days. Plaintiffs then filed a motion to compel more sufficient answers and defendants filed an answer detailing their continued objections. Because the parties were still so far apart with respect to this first set of interrogato-

---

4. *See also Sperry Rand Corp. v. Pentronix, Inc.,* 403 F.Supp. 367, 371 (E.D.Pa.1975) ("[a] distinction must be drawn between a judicial determination derived from evidence and lengthy proceedings had before the court, and a determination not so founded upon facts brought forth in court, but based on attitudes and conceptions that have their origins in sources beyond the four corners of the courtroom) *quoting In re Federal Facilities Realty Trust,* 140 F.Supp. 522, 526 (N.D.Ill.1956).

5. At the time the interrogatories were filed, American Motors Corporation was the only defendant. On October 14, 1982, it was stipulated and agreed that plaintiff be allowed to amend his complaint to add his claims against Jeep Corporation. The amended complaint was filed on October 14, 1982. American Motors Corporation's answers to interrogatories were not filed until October 20, 1982.

ries, I scheduled another conference for April 15, 1983.

The purpose of the April 15 conference was to prod the parties amicably to resolve discovery disputes so that the then completely stalled litigation could proceed. Defense counsel, however, repeatedly stated that plaintiffs' interrogatories were overly broad, burdensome, irrelevant, and could not be answered without incurring significant financial expense. For example, plaintiffs' interrogatory No. 9 asked "with respect to all lawsuits brought against AMC or Jeep Corporation alleging that a jeep vehicle is defective, regardless of the defect alleged give the full caption, date, court term and number and any other information to identify each suit." Defendants' answer stated: "Defendants object to this interrogatory on the grounds that it is overbroad, unduly burdensome and seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence and seeks information subsequent to the date of the accident alleged in this case which is inadmissible as a matter of public policy." This answer is either fatuous or deliberately deceptive. A computer could no doubt retrieve the statistical information with no burden and of course the opportunity for plaintiffs to investigate other accidents could lead to the discovery of highly relevant evidence.

Many of plaintiffs' other interrogatories were met with similar responses. Admittedly, many of plaintiffs' interrogatories were not framed as narrowly as possible, but defendants, rather than answer the questions to the extent possible, declined to answer the questions at all, claiming they were vague, irrelevant, overly broad, and burdensome. Further, if defendants' objections had any validity, they could have been made without having to request two extensions.

At the April 15 conference, I was shown two letters dated August 3, 1973 written by defendants to the National Highway Traffic Safety Administration. In light of the contents of these letters, two interrogatories deserve special attention. For ease of contrast and comments, I shall set forth in columnar form the interrogatories, the answers, and excerpts from the letters with comments:

| Interrogatories | Answers | Letters and Comments |
|---|---|---|
| *Benner* #12: "Does the defendant recognize that the 1975 Jeep CJ–5 vehicles have a greater *tendency to roll over* or overturn . . . | "The term 'tendency to rollover' is not a term that is in common usage in the automotive engineering field and does not have an established meaning or definition." | "An investigation of vehicle crash data indicates that in general vehicles *do not roll over* due to any *inherent tendency toward rollover* in the vehicle itself, but rather the *rollover* is a result of leaving the highway." I quote this merely as an example. Defendants used the term "tendency to roll over" ten more times in its letters, with no apparent difficulty in understanding its meaning. In addition, the letters referred to "rollover resistance" seven times and the word "rollover" (apart from the above) twenty-one times. |
| than an *ordinary automobile*" (emphasis added)? | "Defendant objects to this interrogatory as vague in that the term 'ordinary automobile' is not defined and includes vehicles with widely differing dimensions, designs, and purposes." | "Jeep Corporation wishes to further point out that *certain classes and types of vehicles must contain a greater tendency for rollover than others as a result of practical design for their intended usage.*" . . . "These vehicles are all designed for off-road as well as on-road usage. In order to provide a useful, practical vehicle for the off-road environment, *Jeep must design to a* |

| Interrogatories | Answers | Letters and Comments |
|---|---|---|
| | | *different set of design criteria than those used for vehicles intended for on-road use only."* |
| | | . . . |
| | | "It is likely that the *tendency for rollover* would be greater than that of *a typical passenger car* (emphasis added). |
| | | Obviously, defendants understood what was meant by an "ordinary automobile." |
| *Shank* #11: "Give the name, address, telephone number, job title, department and other pertinent information needed to identify each and every person, group, department, unit, agency, etc. within AMC or Jeep Corporation responsible for consumer safety in the Jeep vehicles from the time AMC acquired Jeep Corporation until the present." | "Defendants are not certain what plaintiffs mean by 'consumer safety' in this context. Safety is a part of vehicle performance, and is therefore involved in all phases of vehicle design and manufacture, and is inherent in the job responsibilities of all personnel involved in vehicle design and manufacture." | Signed "F.A. Stewart, Vice President, Safety and Reliability." |

After about an hour of discussion at the April 15 conference, counsel requested the presence of a court reporter, a request that I granted. The colloquy quoted earlier then ensued.

Since defendants allege, without factual basis, that my opinion was extrajudicially formed, I have recited defendants' conduct in a judicial proceeding, not as showing that my opinion sprang from this case alone, but only as illustrative of the conduct by automotive manufacturers I have encountered as a judge which led to the formation of my opinion.

### III. Conclusion

For the foregoing reasons, defendants' motion to recuse was denied.