**In the Matter of the Extradition of Michele SINDONA, William J. Arico, a/k/a "Robert McGovern" and Robert Venetucci.**

No. 82–2869M.

United States District Court, E.D. New York.

May 3, 1984.

Asst. U.S. Atty. Reena Raggi, E.D.N.Y., Brooklyn, N.Y., for the U.S.

Robert J. Costello, Phelan & Costello, New York City, for Sindona.

Paul A. Goldberger, Goldberger; Feldman & Dubin, New York City, for Venetucci.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

The Republic of Italy has applied for the extradition from the United States to Italy of Michele Sindona, William J. Arico, a/k/a "Robert McGovern" and Robert Venetucci. William J. Arico died on February 19, 1984, while attempting to escape from the Metropolitan Correction Center where he was detained while this proceeding was pending and an order of dismissal as to him was entered on February 21, 1984.

Michele Sindona has moved pursuant to 18 U.S.C. § 3184 for an order dismissing the complaint filed as to him on December 15, 1983 for the reason that the Court did not lawfully obtain jurisdiction over him.

Robert Venetucci has moved pursuant to 28 U.S.C. § 144 for an order of recusal and for an order dismissing the complaint against him for the reason that the requirement of probable cause has not been satisfied.

## I. *Venetucci's Motion for Recusal*

The basis of Venetucci's motion that I recuse myself is that in an order dated October 11, 1983, I ruled on an extradition request made with regard to Charles Arico

and Rocco Messina by the Republic of Italy, and that I could not, therefore, render a fair and impartial judgment in this proceeding concerning him. It is also claimed that in the prior proceeding I expressed my belief in an "existing conspiracy" and in a hearing in this proceeding on January 18, 1984, I called to the attention of Venetucci's counsel "numerous paragraphs from the complaint which would support the Court's original finding of a conspiracy" (Par. 9 of Affidavit of Venetucci's counsel, Paul A. Goldberger, submitted in support of the motion). Finally, in paragraph numbered 10 of the foregoing affidavit, counsel states that "Since this Court has already made up its mind about the existence of a conspiracy in which Mr. Venetucci is also alleged to have been a member, it is impossible for the Court to make the requisite independent fact-finding determination of probable cause."

The statute upon which this motion is predicated, 28 U.S.C. § 144, provides as follows:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a *personal bias or prejudice* either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
>
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists .... (emphasis added)

The "bias or prejudice" to which the affidavit must be addressed is clearly the *personal* bias or prejudice referred to in the first paragraph of § 144.

Mindful of footnote 13 on page 582 of *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 1709, 16 L.Ed.2d 778 (1966), the question that arises is whether I have the jurisdiction to entertain and decide this motion. That footnote reads:

> 13. Judge Wyzanski referred the question of his disqualification to Chief Judge Woodbury of the Court of Appeals for the First Circuit who after hearing oral argument held that no case of bias and prejudice had been made out under § 144.

I have been unable to find a legal requirement that such a referral be made. On the contrary, the overwhelming view expressed in the cases which have addressed the question is that not only do I have the jurisdiction, I have the duty to pass upon the sufficiency of the affidavit as a matter of law. *See, e.g., Garfield v. Palmieri,* 193 F.Supp. 582 (E.D.N.Y.1960), *aff'd* 290 F.2d 821 (2d Cir.), *cert. denied,* 368 U.S. 827, 82 S.Ct. 46, 7 L.Ed.2d 30 (1961); *United States v. Bell,* 351 F.2d 868, 878 (6th Cir.), *cert. denied,* 383 U.S. 947, 86 S.Ct. 1200, 16 L.Ed.2d 210 (1966).

I now turn to the sufficiency of the affidavit as a matter of law. The portions of that affidavit which are relevant to the question of sufficiency have already been referred to. I am moved to observe, preliminarily, that in my prior order of October 11, 1983, I did find that there was "probable cause to believe that Messina and Arico were members of an existing conspiracy and that the statements were made during the course of and in furtherance of that conspiracy ...." That finding has since been affirmed by the Court of Appeals for the Second Circuit on February 7, 1984 (Docket Nos. 83–2336, 83–2338). The name of Robert Venetucci was not known to me until November 1, 1983, when I signed a warrant for his arrest. To suggest, therefore, that when I issued my order of October 11, 1983 I made a determination regarding Robert Venetucci is specious.

As to assertions in the affidavit that the statements I made during the course of the proceeding on January 18, 1984 suggest that I had already decided that Venetucci was a member of an existing conspiracy, those assertions are not supported by the transcript nor are they true in fact.

The claim that my recusal is necessary, or even appropriate, because I have decided the question of probable cause in a related extradition proceeding similarly lacks merit. The controlling principle as

appears in *United States v. Grinnell Corp.*, *supra*, 384 U.S. at 583, 86 S.Ct. at 1710 is as follows:

> The alleged bias and prejudice to be disqualifying must stem from an *extra-judicial* source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. *Berger v. United States*, 255 U.S. 22, 31, 41 S.Ct. 230, 232, 65 L.Ed. 481.

*See also In re International Business Machines Corp.*, 618 F.2d 923 (2d Cir.1980); *King v. United States*, 576 F.2d 432 (2d Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978) and the cases in virtually every circuit collected in *Shank v. American Motors Corp.*, 575 F.Supp. 125, 129 (E.D.Pa.1983), *Phillips v. Joint Legislative Comm.*, 637 F.2d 1014 (5th Cir.1981), *cert. denied*, 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982) precisely addresses Venetucci's assertion here, in observing at p. 1020 that: "[A] motion for disqualification ordinarily may not be predicated on a judge's rulings in the instant case or in related cases, nor on a demonstrated tendency to rule any particular way, nor on a particular judicial leaning or attitude derived from his experience on the bench." I would only add that there has been no demonstration that I have a tendency to rule any particular way or that I have a particular judicial leaning or attitude.

There being no assertion of personal bias or prejudice either against Mr. Venetucci or in favor of any adverse party or of any bias or prejudice stemming from an extrajudicial source, the affidavit in support of the motion for an order of recusal is insufficient as a matter of law and the motion is denied.

## II. *Sindona's Motion to Dismiss for Want of Jurisdiction*

This motion is predicated on a reading of 18 U.S.C. § 3184 which provides in pertinent part as follows:

> Whenever there is a treaty ... for extradition between the United States and any foreign government, any ... judge of the United States, ... may, upon complaint made under oath, *charging any person found within his jurisdiction*, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty ..., issue his warrant for the apprehension of the person so charged, that he may be brought before such ... judge, ... to the end that the evidence of criminality may be heard and considered .... (emphasis added)

Mr. Sindona contends that he is and has been a federal prisoner, committed to the custody of the Attorney General of the United States for a term of 25 years by Judge Thomas Griesa of the United States District Court for the Southern District of New York following his (Sindona's) conviction in connection with the collapse of the Franklin National Bank. Since August 1982, he has been in the Federal Correction Institution at Otisville, New York. Prior to being sentenced in that criminal proceeding, Mr. Sindona lived and worked in Manhattan. A previous extradition proceeding was held in the United States District Court for the Southern District of New York in which the Republic of Italy's request for his extradition was granted and later affirmed. *Sindona v. Grant*, 619 F.2d 167 (2d Cir.1980).

On December 7, 1983, Stephen S. Trott, Assistant Attorney General in the Criminal Division of the U.S. Department of Justice, prepared a memorandum to Norman A. Carlson, Director of the Bureau of Prisons, advising him that he will be contacted by Reena Raggi, an Assistant United States Attorney for the Eastern District of New York, to arrange for the transfer of Mr. Sindona to Brooklyn for his initial appearance and for all other appearances as they may be needed incident to these extradition proceedings.[1] Mr. Sindona contends that

---

**1.** The complete text of that memorandum is as follows:

William Arico and Michele Sindona are federal prisoners housed by you within the Southern District of New York. Both of them are subject

he should have been brought to the Eastern District of New York by a writ of habeas corpus *ad prosequendum;* that such a writ was a procedural pre-requisite and that to have been brought to this Court by any other means was unlawful and should have, *ex proprio vigore,* divested the court of jurisdiction. Sindona relies upon the following cases to support his position: *Morgan v. United States,* 380 F.2d 686, 699 (9th Cir.1967), *cert. denied,* 390 U.S. 962, 88 S.Ct. 1064, 19 L.Ed.2d 1160 (1968); *Rose v. United States,* 365 F.Supp. 841, 843 (N.D.Ill.1973); *Carbo v. United States,* 364 U.S. 611, 81 S.Ct. 338, 5 L.Ed.2d 326 (1961); *Lawrence v. Willingham,* 373 F.2d 731 (10th Cir.1967); *United States v. Schurman,* 84 F.Supp. 411 (S.D. N.Y.1949); *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974), and *Shapiro v. Ferrandina,* 478 F.2d 894 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973).

■ It is not disputed that 18 U.S.C. § 3184 was literally complied with. The extradition complaint was made under oath by Chief Deputy Marshal Michael Pizzi and filed with the Court on December 15, 1983 in the presence of Michele Sindona, who was in the court at the very moment that the oath was administered to the Marshal. The complaint, therefore, was made under oath, charging Sindona, who was then found within the jurisdiction of this court, with the commission of crimes in the Republic of Italy that are covered by a treaty. It is the procedure by which Sindona was "found" within the jurisdiction that is challenged. For the reasons which follow, Sindona's motion to dismiss the complaint on jurisdictional grounds is denied.

The contention that he could have lawfully been brought from the Federal Correc-

to an extradition request recently made by the Government of Italy. Several other individuals involved with them, Charles Arico, Rocco Messina and Roberto Venetucci, were in the Eastern District of New York when they were arrested for extradition to Italy.

The Attorney General has decided that the William Arico and Michele Sindona extradition hearings will also be heard within the Eastern District of New York. He has assigned Assist-

tional Institution in Otisville, New York to this Court only by a writ of habeas corpus *ad prosequendum* is erroneous. *Carbo v. United States, supra,* traces the course followed by Congress in granting judicial power to issue writs of habeas corpus in general and the writ of habeas corpus *ad prosequendum* in particular. That course ended in what is presently 28 U.S.C. § 2241, subdivision (c)(5) thereof being a codification of the common law writ *ad prosequendum.* That writ was issued when it was "necessary to remove a prisoner in order to prosecute him in the proper jurisdiction wherein the offense was committed.... Congress had without qualification authorized the customary issuance of the writ *ad prosequendum* by a jurisdiction not the same as that wherein the prisoner was confined," *Carbo v. U.S., supra,* 364 U.S. at p. 615, 81 S.Ct. at p. 340. And at page 621, 81 S.Ct. at 344, the court continued, "That comity is necessary between sovereignties in the administration of criminal justice in our federal-state system is given full recognition by affording through use of the writ both respect and courtesy to the laws of the respective jurisdictions." As *Carbo* makes plain, the traditional use of the writ *ad prosequendum* has been to bring a defendant in the custody of another sovereign to trial before the court issuing the writ. *Lawrence v. Willingham, supra,* 373 F.2d at 732; *United States v. Hooker,* 607 F.2d 286, 288 (9th Cir.1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1083, 63 L.Ed.2d 321 (1980); *In re Liberatore,* 574 F.2d 78 (2d Cir.1978). That traditional use of the writ is reflected in each case relied upon by Sindona: *Morgan v. U.S., supra* (removal from state prison to federal court to stand trial); *Rose v. U.S., supra* (removal from federal correc-

ant United States Attorney Reena Raggi to represent the Government of Italy.

When Ms. Raggi is prepared to institute proceedings against the other two, she will contact you, or your designated representative, in order to arrange for their transfer to Brooklyn for their initial appearance, and then whenever they are needed for a court appearance. Thank you for your cooperation.

tional institution to state court); *Carbo v. U.S., supra* (removal from state prison to federal court); *Lawrence v. Willingham, supra* (removal from federal correctional institution to state court); *United States v. Schurman, supra* (removal from state prison to federal court). *See also Interstate Agreement on Detainers Act,* 18 U.S. C.App. II. The transfer of Sindona from one federal facility to another federal facility or to a federal court did not require the issuance of a writ *ad prosequendum.* Nor would its use in such a case have been traditional.

It might be useful to note that the writ *ad prosequendum* is not the exclusive tool to effectuate federal-state extradition. 18 U.S.C. § 4085 provides:

> (a) Whenever any federal prisoner has been indicted, informed against, or convicted of a felony in a court of record of any State or in the District of Columbia, the Attorney General shall, if he finds it in the public interest to do so, upon the request of the Governor or the executive authority thereof, and upon the presentation of a certified copy of such indictment, information or judgment of conviction, cause such person, prior to his release, to be transferred to a penal or correctional institution within such State or District.

> If more than one such request is presented in respect to any prisoner, the Attorney General shall determine which request should receive preference.

> The expense of personnel and transportation incurred shall be chargeable to the appropriation for the "Support of United States prisoners."

> (b) This section shall not limit the authority of the Attorney General to transfer prisoners pursuant to other provisions of law.

That statute manifestly echoes Chief Justice Taft in *Ponzi v. Fessenden,* 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607 (1922) at pp. 261–262, 42 S.Ct. at p. 311: "There is no express authority authorizing the transfer of a federal prisoner to a state court.... Yet we have no doubt that it exists and is to be exercised with the consent of the Attorney General. In that officer, the power and discretion to practice the comity in such matters between the federal and state courts is vested." *See also Atkinson v. Hanberry,* 589 F.2d 917 (5th Cir.1979).

■ Having established that the writ *ad prosequendum* was neither necessary nor appropriate, was Sindona lawfully transferred from the federal correctional institution at Otisville, New York to the Metropolitan Correctional Center (MCC) in New York City (the federal holding facility for the Eastern and Southern Districts) and periodically from the MCC to the Marshal's holding facility in the federal courthouse in Brooklyn pursuant to the direction of the Attorney General or his designated representative embodied in the Memorandum dated December 7, 1983 set out in full in the footnote?

■ The prisons of the United States and the custody of prisoners under sentence are generally under the supervision and regulation of the Attorney General. 18 U.S.C. §§ 4041, 4042. "The Attorney General may designate as a place of confinement any available, suitable, and appropriate institution or facility, whether maintained by the Federal Government or otherwise, and whether within or without the judicial district in which the person was convicted, *and may at any time transfer a person from one place of confinement to another.*" 18 U.S.C. § 4082(b) (emphasis added). That Sindona was lawfully transferred from one place of confinement to another at the direction of the Attorney General pursuant to § 4082(b) is plain.

Although not explicitly raised during oral argument or in his memoranda of law, I will assume that by his reference to *United States v. Toscanino, supra,* 500 F.2d 267, Sindona is asserting by implication either (1) that he had a due process right to a hearing prior to transfer, or (2) this Court should refuse to exercise jurisdiction on the authority of *Toscanino.*

As to the first, the due process clause in and of itself does not protect a duly convicted prisoner against transfer from one

institution to another within either the state or the federal prison system. In *Atkinson v. Hanberry, supra,* the court said: "Whatever expectations the prisoner may have in remaining at a particular prison ... it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or no reason at all." 589 F.2d at 920 (quoting *Meachum v. Fano,* 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976). *See also Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).

As to his reliance on *Toscanino,* it is misplaced. In that case, the defendant was kidnapped from Uruguay and transported to Brazil where he was tortured, drugged and brought to the United States. The court was moved to state that "... we think a federal court's criminal process is abused or degraded where it is executed against a defendant who has been brought into the territory of the United States by the methods alleged here.... We could not tolerate such an abuse without debasing 'the process of justice.' " 500 F.2d 267 at 276. There isn't the slightest resemblance between this case and *Toscanino.* Sindona's presence in this Court was not secured by force or fraud nor could any claim be made that it was.

Finally, Sindona seeks to sustain his jurisdiction argument by reliance upon *Shapiro v. Ferrandina, supra.* In that case, Shapiro's extradition was requested of the United States by the State of Israel. A warrant for his arrest was signed by Judge Motley of the District Court for the Southern District of New York, pursuant to which Shapiro was arrested at his home in Brooklyn and was brought before Judge Pollack of the Southern District. Shapiro contended that the complaint and warrant for his arrest issued by Judge Motley failed to explicitly state that he was "found" within the Southern District of New York. The Court dismissed that contention as meritless since § 3184 calls only for a complaint under oath stating that the person sought has committed within the jurisdiction of the requesting country a crime cov-

ered by a treaty. His attack upon the validity of his arrest based upon a complaint and a warrant he insisted were defective was rejected. In "seeking a warrant in the Southern District ..." said the court, "the government was acting on a good faith belief that Shapiro could be 'found' there." *Shapiro v. Ferrandina, supra,* 478 F.2d at 899, 900. Shapiro also contended that even if his arrest in Brooklyn was valid, he should then have been taken before a judge in the Eastern District for the extradition hearing. For that he relied upon *Pettit v. Walshe,* 194 U.S. 205, 24 S.Ct. 657, 48 L.Ed. 938 (1904). After analyzing the holding in *Walshe,* the court concluded that it had no application to Shapiro's case.

*Shapiro v. Ferrandina,* in any event, has no relevance here. Sindona was not arrested following the issuance of a warrant which can be claimed to be defective. There was no warrant. Nor can there be any dispute as to whether the recitations in the complaint were proper or made in good faith. There was no mistake about where Mr. Sindona was. Par. 81 of Marshal Pizzi's complaint states as follows:

MICHELE SINDONA is presently in the custody of the Attorney General serving the sentence detailed ¶ 5, *supra.* He will be transferred by order of the Attorney General from the Federal Correctional Institution, Otisville, New York, to the Federal Courthouse, Eastern District of New York, by the Bureau of Prisons and United States Marshal's Service on or about December 15, 1983 to allow for the filing of this complaint and the commencement of extradition proceedings.

As I have already indicated, the statute (18 U.S.C. § 3184) was precisely complied with and Sindona's motion to dismiss the complaint for the reason that the court lacked jurisdiction over him is denied.

■ Having ruled on the motion and stated my reason for the ruling, I am moved to make several other observations, being fully aware that an "over-speaking judge is no well-tuned cymbal." I believe

that the phrase "found within his jurisdiction" in 18 U.S.C. § 3184 does not mean the equivalent of being discovered within the jurisdiction. That is to say, the word "found" should not be read as the past tense of "find," but rather, should be read as being synonymous with "present" and the phrase would thus be read as "present within his jurisdiction." [2]

■ The purpose of the extradition hearing required by § 3184 is not to adjudicate guilt or innocence, but to determine whether the alleged offenses with which the defendant is charged are covered by the extradition treaty and whether an official with jurisdiction (a judge or magistrate) was presented with any evidence to warrant a finding that there was reasonable ground to believe the defendant is guilty. *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); *Melia v. United States*, 667 F.2d 300, 302 (2d Cir.1981); *Simmons v. Braun*, 627 F.2d 635, 637 (2d Cir.1980). Rule 18 of the Fed.R.Crim.P., which requires that a prosecution shall be had in a district in which the offense was committed can have no application here since the alleged offense was committed within the jurisdiction of Italy. It is there that Sindona will be prosecuted if he is extradited. The constitutional provisions, statutes and rules (e.g., Art. III, section 2; Rules 18, 20 Fed.R. Crim.P., 18 U.S.C. § 3237 et seq.) with which venue in federal criminal cases are intertwined are not at all implicated in an extradition proceeding. The only venue requirement in such a proceeding is that the hearing "be held on land, publicly, and in a room or office easily accessible to the public." 18 U.S.C. § 3189.

### III. *The Extradition Request*

#### A. *Pre-requisites to Extradition*

The request for the extradition of Sindona and Venetucci was made in accordance

with Article XI of the Treaty of Extradition between the United States and Italy, 26 U.S.T. 495, T.I.A.S. 8052 (1973) (hereafter "Treaty"). That Article requires:

1. That the request be made through diplomatic channels.

■ This requirement was satisfied by the submission to the court of three declarations by T. Michael Peay, Deputy Assistant Legal Adviser in the Office of the Legal Adviser for the United States Department of State, each dated December 6, 1983, attesting to that fact and annexing to each declaration the diplomatic notes from the Embassy of Italy to the Department of State requesting the extradition of Sindona and Venetucci.

2. That the request be accompanied by a description of the person sought, a statement of the facts of the case, the text of the applicable laws of the requesting Party including the law defining the offense, the law prescribing the punishment for the offense, and the law relating to the limitation of the legal proceedings or the enforcement of the penalty for the offense.

■ This requirement was satisfied by the documentary submissions by the Republic of Italy which are embraced by eight packets, seven of which are certified by the Ambassador of the United States and one by the United States Charge d'Affaires in accordance with 18 U.S.C. § 3190. Those packets are dated March 15, 1982, March 7, 1983, April 19, 1983, July 7, 1983, October 28, 1983 (Vol. I); October 28, 1983 (Vol. II); October 28, 1983 (Vol. III) and November 28, 1983.

3. That the request be accompanied by a warrant of arrest issued by a judicial officer of the requesting party and by such evidence as, according to the laws of the

---

**2.** It is interesting to note in this regard that Article I of the Treaty of Extradition between the United States of America and Italy, 26 U.S.T. 495, T.I.A.S. 8052 (1973) provides that "Each Contracting Party agrees to extradite to the other, in the circumstances and subject to the conditions described in this Treaty, persons found

in its territory who have been charged with or convicted of any of the offenses mentioned in Article II of the Treaty committed within the territory of the other or outside thereof under the conditions specified in Article III of this Treaty.

requested party, would justify his arrest and committal for trial if the offense had been committed there, including evidence that the person arrested is the person to whom the warrant of arrest refers.

Warrants for the arrest of Michele Sindona were issued by Judge Gherardo Colombo and Judge Giulano Turone of the Milan (Italy) Civil and Criminal Court on July 15, 1981 (Documents numbered 2 and 3 in the packet of March 15, 1982); by Judge Giulano Turone on October 22, 1982 (Document number 1 in the packet of October 28, 1983, Volume 1). A warrant for the arrest of Robert Venetucci was issued by Judge Giulano Turone on September 27, 1983 (Document number 2 in packet of October 28, 1983, Volume I). That portion of this requirement pertaining to the evidence will be addressed hereafter.

4. That the warrants of arrest, deposition and other evidence given under oath or certified copies of those documents, shall be admitted in evidence in the examination of the request for extradition when they bear the signature or are accompanied by the attestation of a judge, magistrate, or other official or are authenticated by the official seal of the Ministry of Justice and, in any case, are certified by the principal diplomatic or consular office of the United States. Any deposition or other evidence which was not given under oath shall be admitted in evidence when there is an indication that the deponent was informed by the appropriate authorities of the penal sanctions to which he would be subject in the case of false or incomplete statements.

An examination of the documents submitted by the Republic of Italy reveals that these requirements have been satisfied. *See also* 18 U.S.C. § 3190.

### B. *General Principles*

Before considering the sufficiency of the documents as requiring a finding that the extradition request should be granted or denied, a statement of the principles applicable to an extradition hearing may be helpful.

 The purpose of the extradition hearing is not to determine the guilt or innocence of the persons whose extradition is requested. Rather, the court must determine whether: (1) there is a valid extradition treaty between the Republic of Italy and the United States; (2) Michele Sindona and Robert Venetucci are the persons sought; (3) the offenses with which they are charged are extraditable; (4) the requirements of "double criminality" are satisfied; (5) there is probable cause to believe that Sindona and Venetucci committed the offenses for which their extradition is requested; (6) the required documents are presented in accordance with the laws of the United States, translated and duly authenticated by a United States Consul; and (7) all other treaty requirements and procedures have been followed. Bassiouni, International Extradition, United States Law and Practice IX § 5–1 (1983). The Federal Rules of Evidence are not applicable in an extradition proceeding (Fed.R.Ev.Rule 1101(d)(3)) and hearsay is admissible.

### IV. *The Evidence*

A. At the outset, I find that there is a valid extradition treaty between the Republic of Italy and the United States; that Michele Sindona and Robert Venetucci are the persons sought; and that the required documents are presented in accordance with the laws of the United States, translated and duly authenticated by a United States Consul. I shall now address the remaining requirements which must be satisfied before the extradition request may be granted as to Sindona and Venetucci separately.

### B. *The Extraditability of the Offenses Charged and "Double Criminality":*

#### 1. *Sindona*

 The Republic of Italy has charged Michele Sindona with crimes of murder, extortion and conspiracy to commit extortion, receiving stolen property and conspiracy to commit the crime of receiving stolen property. The offenses

with which he is charged are extraditable.

2. *Venetucci*

The Republic of Italy has charged Robert Venetucci with the crimes of extortion and conspiracy to commit the same.

Article II of the Treaty provides in relevant part:

Persons shall be delivered up according to the provisions of this Treaty for any of the following offenses provided that these offenses are punishable by the laws of both Contracting Parties and subject to a term of imprisonment exceeding one year.

1. Murder

\* \* \* \* \* \*

16. Extortion by private or public persons.

17. Receiving or transporting any money, valuable securities or other property knowing the same to have been unlawfully obtained ...

\* \* \* \* \* \*

30. ...

Extradition shall also be granted for attempts to commit, conspiracy to commit or participation in, any of the offenses mentioned in this Article.

3. The offenses for which Sindona and Venetucci are sought to be extradited are punishable by the laws of both the Contracting Parties and are subject to a term of imprisonment exceeding one year. Italian Penal Code, Articles 56, 61, 81, 110, 112, 339, 575, 577, 610, 629, 648; 18 U.S.C. §§ 2, 371, 641, 875, 1952, 1961, 1962; New York Penal Law §§ 105.10, 110.00 et seq.; 125.00 et seq; 135.65, 155.40.

■■■■ Although Article II of the Treaty requiring that offenses be "punishable by the laws of both Contracting Parties" if read literally would preclude reference to the laws of New York since New York is not a Contracting Party, it is well settled that treaties are to be construed liberally rather than literally. *Factor v. Laubenheimer,* 290 U.S. 276, 293, 54 S.Ct. 191,

195, 78 L.Ed. 315 (1933). Thus, in *Hu Yau Leung v. Soscia,* 649 F.2d 914 (2d Cir.) *cert. denied,* 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 389 (1981), the court decided that the phrase "Under the law of the United States of America" in an extradition treaty must be taken to include both the state and federal law in the absence of evidence that the contrary was intended. *See also Wright v. Henkel,* 190 U.S. 40, 58, 23 S.Ct. 781, 785, 47 L.Ed. 948 (1903). It is also immaterial that the criminal activity as defined in the United States Code or the New York Penal Law is not characterized in precisely the same way as is that activity under Italian Law. "The law does not require that the name by which the crime is described in the two countries shall be the same.... It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel,* 259 U.S. 309, 312, 42 S.Ct. 469, 470, 66 L.Ed. 956 (1922).

I find, therefore, that the offenses with which Sindona and Venetucci are charged are extraditable under the Treaty and that the requirement of "double criminality" is satisfied; that is, the offenses are punishable by the laws of the Contracting Parties and subject to a term of imprisonment exceeding one year.

C. *The Requirement of Probable Cause*

1. *Sindona*

a. *The Murder of Giorgio Ambrosoli*

■■■ The collapse of the financial enterprises of Michele Sindona both here and abroad and the criminal proceedings which followed are recounted in *United States v. Sindona,* 636 F.2d 792 (2d Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302.(1981) (in which he was convicted of fraud, perjury and bail jumping) and in *Matter of Sindona,* 450 F.Supp. 672 (S.D.N.Y.1978), *aff'd sub nom. Sindona v. Grant,* 619 F.2d 167 (2d Cir.1980) (extradited to Italy to face charges of bankruptcy fraud).

Giorgio Ambrosoli, a lawyer, was appointed by the Italian Ministry of the Trea-

sury on September 27, 1974 as the liquidator of Banco Privata Italiana (BPI) which was formed only months before from the merger of two Sindona-controlled banks, the Banca Unione (BU) and the Banca Privata Finanziaria (BFP). Mr. Ambrosoli's role was to reconstruct the bookkeeping records of the bank with a view to possibly recovering some or all of its assets for distribution to creditors (Document # 1, March 15, 1982 packet).

Following the decree of the Ministry of the Treasury which forced BPI into liquidation and named Mr. Ambrosoli as liquidator, a consortium was formed of three banks owned by the Republic of Italy for the purpose of repaying depositors of BPI. Funds for that purpose were to be obtained from Banca D'Italia, the Italian Central Bank. The three banks constituting the consortium were Banco diRoma, Banca Commerciale Italiana and Credito Italiano, Ltd.

Beginning in approximately 1976, Sindona, through various intermediaries, proposed to highly placed government and bank officials various plans to settle the bank's difficulties at the least cost to himself and to avoid the criminal prosecution he faced for his role in causing the collapse of the banks he controlled in Italy and of the Franklin National Bank in the United States. One of the persons Sindona sought to enlist on his behalf was Mr. Enrico Cuccia, a prominent banker in Milan. (Document # 7, Packet of October 28, 1983, Volume I).

The settlement plans were not favorably received and Sindona formed the belief that Ambrosoli and Cuccia were responsible for the rejection of those plans and that they were the persons who were blocking the road to his salvation. (*See, e.g.*, Documents 1, 2 and 7, Packet of March 15, 1982). To eliminate the obstacle he presented, Sindona embarked upon a campaign of villification and harassment of Ambrosoli which escalated to threats and finally to his death by murder at approximately midnight on July 11, 1979 as he was returning to his home in Milan.

The villification and harassment of Mr. Ambrosoli is evidenced by the following:

(1) An interview Sindona gave to Il Fiorino, an Italian newspaper, on February 21, 1976 in which he accused Mr. Ambrosoli of embezzlement and characterized him as a low level lawyer who undertook a task that was too big for him (Document # 4, Packet of March 15, 1982).

(2) A denunciation of Ambrosoli , and complaint against him lodged with the Republic Attorney's Office at the Court of Milan (Document # 5, Packet of March 15, 1982). The Court of Milan subsequently found that there was no basis for instituting any proceedings against Mr. Ambrosoli (Document # 6, Packet of March 15, 1982).

(3) A letter to the Governor of the Bank of Italy charging Ambrosoli with bias, unethical behavior; incompetence, bad faith and urging his removal (Document # 8, Packet of March 15, 1982).

(4) A letter to the General Manager and Editor of Corriere-della Sera, an Italian newspaper, in which he calls Ambrosoli a thief, a low level lawyer who resorts to scandal to conceal his own inadequacies and expresses the wish that his charges be brought to the attention of the Bar so that Mr. Ambrosoli can be disciplined (Document # 9, Packet of March 15, 1982).

The threats directed against Mr. Ambrosoli and attributed to Sindona are reflected in the following documents:

(1) Document # 10, Packet of March 15, 1982, a transcription of a recorded telephone call to Ambrosoli, in which he is told "you only deserve to die killed as a cuckold, you are a cuckold and a bastard."

(2) Document # 11, Packet of March 15, 1982, a deposition of Enrico Cuccia, in which he relates that Sindona told him during a meeting between them in New York in April 1979 that he (Sindona) would have Ambrosoli disappear without leaving a trace of him. *See also* Document # 6, Packet of July 7, 1983.

(3) Document # 15, Packet of October 28, 1983 Vol. II, deposition of Luigi DiFon-

zo, in which he testifies that Sindona's son Nino told him of Sindona's involvement in the threats to Ambrosoli.

(4) Document # 16, Packet of October 28, 1983, Vol. II, tape recorded interview of Nino Sindona by Luigi DiFonzo.

Robert Venetucci and William Arico were prisoners at the same time at the Federal Correctional Institution in Lewisburg, Pennsylvania. There came a time, after they were released from prison that Venetucci introduced Arico to Sindona (Documents # 10, 15, Packet of October 28, 1983, Vol. II; *see also* Document # 14, Packet of March 15, 1982). Arico thereafter informed Henry Hill (by whom he was employed in criminal ventures) that he (Arico) was a contract murderer for Sindona (Document # 1, Packet of July 7, 1983; Document # 10, Packet of October 28, 1983, Vol. II).

Arico, using the alias of William McGovern, made numerous trips to Milan, Italy (Documents # 18, 19, 20, 21, Packet of October 28, 1983, Vol. III). He was in Milan when Ambrosoli was murdered (Documents # 21, 22, Packet of October 28, 1983, Vol. III). A witness to the shooting of Ambrosoli, Emilio Bollani, testified that the murderer emerged from a red Fiat 127, fired at Ambrosoli and departed in that vehicle (Document # 26, Packet of October 28, 1983, Vol. III). That William Arico rented a red Fiat 127 in Milan prior to the murder of Ambrosoli and returned it the following morning is evidenced by Documents # 22, 24, Packet of October 28, 1983, Vol. III. That William Arico arrived at JFK Airport on July 12, 1979 is evidenced by Document # 18, Packet of October 28, 1983, Vol. III. It should also be noted that the bullets taken from the body of Giorgio Ambrosoli during the autopsy were very probably 357 magnum caliber fired from a single gun— either a Smith and Wesson or Ruger revolver of corresponding caliber (Document # 17, Packet of March 15, 1982). Henry Hill testified that in September or October 1978, he sold six or seven guns to William Arico which, Arico said, he intended to use to commit murders in Italy for Michele

Sindona. Among the guns sold to Arico were two Smith and Wesson 357 caliber pistols (Document # 1, Packet of July 7, 1983). Finally, Document # 1, Packet of March 7, 1983, evidences the existence of Swiss bank accounts in the name of McGovern-Arico. See also Packet of November 28, 1983, Official Statement of Guido Viola.

Based upon the documents to which specific reference has been made, together with all the other evidence presented in accordance with the Treaty and the laws of the United States, I find there is probable cause to believe that Giorgio Ambrosoli was murdered and that his murder was instigated, procured and paid for by Michele Sindona.

b. *Extortion and Conspiracy to Commit Same*

 As has been previously mentioned, Sindona had formed the belief that Enrico Cuccia could materially assist in obtaining the approval of the settlement plans Sindona had proposed and that his refusal to lend his assistance was a significant cause of the difficulty in which Sindona found himself. The Republic of Italy asserts that failing to obtain Mr. Cuccia's assistance upon request, Sindona caused threatening telephone calls, letters and other coercive measures (e.g., arson) to be directed at Cuccia in the hope that he could, by such measures, obtain the helpful intervention of Cuccia that he could not obtain merely for the asking.

That Sindona was obsessed by the belief that Mr. Cuccia could rescue him from his difficulties and that he embarked upon a plan to extort Cuccia's assistance is reflected in Documents # 7, 11, 21, 22 of Packet of March 15, 1982.

Threatening telephone calls were received by Mr. Cuccia from May 1977 until approximately April 1980 (Document # 11, Packet of March 15, 1984). One threat was also received by letter in September 1979 (Document # 6, Packet of July 7, 1983). As to the letter, Miceli Crimi testified before Judges Turone and Colombo on June 15, 1981 that the typewriter used to write

the threatening letter to Enrico Cuccia in September 1979 was the same typewriter he gave to Sindona in August 1979 (Document #20, Packet of March 15, 1982).

The threatening telephone calls received by Mr. Cuccia have been testified to by him in depositions reflected in Documents #11, 24, Packet of March 15, 1982; Documents #6, 7 and 8, Packet of July 7, 1983.

The acts of arson aimed at Mr. Cuccia's residence are described in Mr. Cuccia's deposition of June 8 and 9, 1983, Document #6, Packet of July 7, 1983.

In the *Matter of the Extradition of Rocco Messina and Charles J. Arico, a/k/a Charles J. Pido*, decided by me on October 11, 1983, 83 Misc. 1004, *aff'd* 728 F.2d 77 (2d Cir.1984), I granted a request by the Republic of Italy for the extradition of Messina and Charles Arico. I found that there was probable cause to believe that they committed the crimes with which they were charged: complicity in aggravated private violence and complicity in aggravated attempted extortion. That finding was based on transcriptions of recorded telephone calls made on March 28, 1980, in which threats against Mr. Cuccia and his family were made. The voices of the persons making those calls were identified as belonging to Messina and Charles Arico (see Documents #5, 10 and 11, packet of October 28, Vol. I).

Charles Arico is the stepson of William Arico and Rocco Messina was William Arico's neighbor (see Document #1, Packet of July 7, 1983).

William Arico's visits to Milan, particularized as to dates and hotels in which he was registered, are set forth in the deposition of Police Sergeant Orlando Gotelli, Document #21, Packet of October 28, 1983, Vol. III. On at least three of those visits, Arico was accompanied by Rocco Messina.

Arico's efforts to locate Mr. Cuccia are revealed in the deposition of Mariangela Quaglierini (Document #23, Packet of March 15, 1982 and Document #6, Packet of October 28, 1983, Vol. I).

That Michele Sindona was implicated in and directed the threats against Mr. Cuccia is reflected in Documents #15 and 16, Packet of October 28, 1983, Vol. II and in the depositions of Enrico Cuccia (see Document #11, Packet of March 15, 1982 and Document #5, Packet of October 28, 1983, Vol. I).

Telephone threats were also directed at Giorgio Ambrosoli which were calculated to coerce him to take such action as would result in the favorable disposition of Sindona's difficulties (Documents #7 and 8, Packet of October 28, 1983, Vol. I).

Based upon the documents specifically referred to and upon all the evidence submitted by the Republic of Italy, I find that there is probable cause to believe that Michele Sindona committed the crimes of extortion and conspiracy to commit extortion.

c. *Receiving Stolen Property and Conspiracy to Commit Same*

■ Dr. Guido Viola, who has been referred to during the course of this decision as judge and who is referred to in the various documents before the court as Magistrate or Inquiring Magistrate or as Magistrate with functions of Assistant Public Prosecutor of the Republic of Italy in Milan stated, in the documents contained in the packet of November 28, 1983 as follows:

1. Giorgio Ambrosoli, in his capacity as Liquidator of the Banca Privata Italiana was a "public official."

2. The investigations conducted by Mr. Ambrosoli in his capacity as Liquidator were covered by "official secrecy."

3. The reports written by Mr. Ambrosoli were covered by official secrecy until made available to the parties by the Magistrate in May, 1979.

4. If Sindona were in possession of such reports prior to the time when the restraint of official secrecy had been lifted, his possession would have been unlawful and upon receiving the report would be committing the crime of receiving something which had been procured unlawfully.

During the course of a meeting with Sindona in New York on April 10, 1979, Cuccia was informed by Sindona that the latter was in possession of the report Mr. Ambrosoli prepared for the Magistrate (see Document # 11, packet of March 15, 1982 and Document # 6, packet of July 7, 1983).

In a deposition of Mrs. Xenia Dittrich taken on July 20, 1983, she testified that she was Michele Sindona's secretary in 1977, 1978 and 1979 in New York. She also testified that Sindona had a copy of Mr. Ambrosoli's report which he requested her to retype (Document # 4, packet of October 28, 1983, Vol. I).

Based upon the documents specifically referred to and upon all the evidence submitted by the Republic of Italy, I find that there is probable cause to believe that Michele Sindona committed the crime of receiving stolen property and conspiracy to commit the same.

## 2. *Venetucci*

The assertion of the Republic of Italy that there is probable cause to believe that Venetucci committed the crimes of conspiracy to commit extortion and extortion is based upon the evidence submitted in support of its extradition request as follows:

Among the many threatening phone calls received by Enrico Cuccia, as has already been discussed, two were received in February 1980. One was received on February 5th and the other on February 28th. Those calls were recorded and the recordings transcribed (*see* attachments to Cuccia Deposition, Document # 5, Packet of October 28, 1983, Vol. I). Threats, explicit and implicit, are conveyed for the purpose of coercing Mr. Cuccia to take some action on behalf of Sindona. The lives of Mr. Cuccia's family, as well as his own life are clearly threatened.

James Stein, a probation officer with the United States Probation Service, listened to the tape recordings of those two telephone conversations and identified the voice of the caller as belonging to Robert Venetucci. Mr. Stein's identification of Venetucci's voice is based on conversations he has had with Venetucci no less than once a month for approximately three years while supervising Venetucci who was on parole for a 1973 federal narcotics conviction (*see* Document # 14, packet of October 28, 1983, Vol. II).

Venetucci made application at the extradition hearing for leave to call an expert witness who would cast doubt upon the identification of Venetucci's voice on the recorded telephone conversations. His application was denied. As has already been stated, "[a]n extradition hearing is not the occasion for an adjudication of guilt or innocence." *Melia v. United States*, 667 F.2d 300, 302 (2d Cir.1981). "As in the case of a grand jury proceeding, a defendant has no right to cross-examine witnesses or introduce evidence to rebut that of the prosecutor.... In the exercise of the extraditing judge's discretion, a fugitive may be permitted to offer explanatory testimony, but may not offer proof which contradicts that of the demanding country." *Messina v. United States, supra*, 728 F.2d at 80. The offer of proof made by Venetucci was contradictory, not explanatory.

Venetucci's affiliation with Sindona and Arico has previously been adverted to. Venetucci knew Arico as a fellow inmate at the Federal Correctional Institution at Lewisburg, Pennsylvania and introduced Arico to Michele Sindona (Document # 10, Packet of October 28, 1983, Vol. II and Document # 14, Packet of March 15, 1982). Sindona telephoned Venetucci on several occasions (Document # 28, packet of October 28, 1983, Vol. III) and papers pertaining to Venetucci were among the documents taken from Arico when he was detained by Customs Agents (Document # 3, Packet of October 28, 1983, Vol. I). That Sindona and Venetucci were known to each other and were involved in the threats made to Ambrosoli and Cuccia is also reflected in Document # 16, Packet of October 28, 1983, Vol. II, which also reveals that large sums of money were paid to Venetucci by Sindona for the services Venetucci performed in that connection. Much of that money was laundered through Swiss banks

(*see* Document # 29, Packet of October 28, 1983, Vol. III and Affidavit of Special Agent Thomas K. Gilligan in Packet of November 28, 1983; *see also* Document # 16, Packet of October 28, 1983, Vol. II).

Based upon the documents specifically referred to and upon all the evidence submitted by the Republic of Italy, I find that there is probable cause to believe that Robert Venetucci committed the crimes of extortion and conspiracy to commit the same, and his motion to dismiss the complaint against him is denied.

Neither Sindona nor Venetucci have challenged the existence of a valid extradition treaty between the Republic of Italy and the United States, or that they are the persons sought, or that the offenses with which they are charged are extraditable, or that the requirements of double criminality are satisfied, or that the required documents are duly presented, translated and authenticated and that all other treaty requirements and procedures have been followed. Venetucci challenged the existence of probable cause and moved to dismiss the complaint against him on that ground. His motion was denied.

Sindona's challenge to this proceeding related only to the jurisdiction of the court to entertain it. At the hearing on February 21, 1984, counsel for Sindona stated that he was authorized by Sindona to inform the court that "We had no intention of presenting any evidence in opposition to the extradition motion, to the complaint based upon the documents sent.... The reason we offer no evidence in opposition is because we recognize this proceeding cannot determine Mr. Sindona's innocence and only a proceeding in Italy can. Mr. Sindona desires to have such a proceeding and to be able to prove his innocence, and frankly, would like to prove his innocence as soon as possible." (Tr. pp. 31–32).

In sum, the Court finds that: (1) there is a valid extradition treaty between the Republic of Italy and the United States; (2) Michele Sindona and Robert Venetucci are the persons sought; (3) the offenses with which they are charged are extraditable;

(4) the requirements of "double criminality" are satisfied; (5) there is probable cause to believe that Michele Sindona and Robert Venetucci committed the offenses with which they are charged; (6) the required documents are presented in accordance with the laws of the United States, translated and duly authenticated by a United States Consul; and (7) all other treaty requirements and procedures have been followed.

Accordingly, the request of the Republic of Italy for the extradition of Michele Sindona and Robert Venetucci is granted. Article V, Treaty.