**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**James E. HOOKER, Defendant-Appellee.**

**No. 79–1299.**

United States Court of Appeals,
Ninth Circuit.

Oct. 26, 1979.

Donald M. Currie, Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellant.

Irwin H. Schwartz, Federal Public Defender, Tacoma, Wash., for defendant-appellee.

Before DUNIWAY, PECK * and HUG, Circuit Judges.

DUNIWAY, Circuit Judge:

The district court dismissed for post indictment delay an indictment filed against James E. Hooker on July 13, 1976. The government appeals from the judgment of dismissal, and we reverse. The question presented is whether the government, in the case of an indicted defendant

---

* The Honorable John W. Peck, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

who is a prisoner in a foreign country, and not charged by the government with an extraditable offense, must nevertheless make a diligent, good faith effort to bring the defendant to this country to stand trial. To this question our answer is no.

## I. The Facts.

Hooker and Richard Schmidt were arrested in Peru on January 6, 1976, for violation of the Peruvian narcotics laws. The facts leading to their arrest and imprisonment in Peru are stated in our opinion in *United States v. Schmidt*, 9 Cir., 1978, 573 F.2d 1057. Shortly after they were incarcerated in Peru, Hooker and Schmidt were interrogated by William Boggs, a Seattle DEA agent who told them that if they "cooperated," the government would attempt to have them returned to the United States. Hooker had asked that he be returned to the United States for trial. However, Hooker did not "cooperate" and the government made no effort to return him from Peru. Had the government made such an effort, it could not have done so by way of extradition because narcotics offenses are not extraditable under the United States extradition treaty with Peru. 31 Stat. 1921, Article II.

On July 13, 1976, a two count indictment was filed in the Western District of Washington alleging that Hooker and Schmidt had knowingly conspired to import, and cause to be imported, cocaine in violation of 21 U.S.C. §§ 952 and 963. Hooker escaped from Peruvian custody in July 1977 and fled to Ecuador. In September 1977, he was returned to the United States to face trial. Shortly thereafter, he filed a waiver of speedy trial in the Western District of Washington requesting a continuance of his case pending Schmidt's appeal from his conviction.

In November 1978, Hooker filed a motion to dismiss, alleging that he had been denied his Sixth Amendment right to a speedy trial because the government had failed to make a diligent good faith effort to obtain his release from Peruvian custody so that he could be tried. In response, the government asserted that the delay in bringing Hooker to trial was attributable to Hooker himself by virtue of his violation of Peruvian laws and resultant incarceration and, alternatively, that should the court wish to examine Hooker's factual allegations in support of his motion, an evidentiary hearing should be held. The court granted Hooker's motion, and entered a judgment of dismissal.

## II. The Merits.

The trial court found that the government's response to the motion to dismiss was inadequate because it "made no offer of testimony," resulting, under Western Washington Local Rule Cr.R. 45(d), in a deemed admission that opposition to the motion based upon allegations of fact was without merit. The trial court's grounds for granting the motion to dismiss were that Hooker asked to be returned to the United States for trial, that the government was obligated to make a diligent, good faith effort to effect his return for trial, and that the delay caused by the government's failure to do so was so long as to affect Hooker adversely, thus denying his right to a speedy trial. The government then filed a motion for reconsideration, requesting an evidentiary hearing at which testimony would be presented refuting Hooker's speedy trial allegations. The court denied the motion for reconsideration on the ground of its inadequacy, because the government failed to comply with the local rule in that it did not make the factual showing necessary to controvert Hooker's claims when the motion to dismiss was before the court.

In support of its decision on the merits, the trial court cited *United States v. McConahy*, 7 Cir., 1974, 505 F.2d 770, and two district court decisions that follow it, *United States v. Rowbotham*, D.Mass., 1977, 430 F.Supp. 1254; *United States v. Raffone*, S.D.Fla., 1975, 405 F.Supp. 549. All three cases involved defendants incarcerated in foreign countries and held that dismissal for post indictment delay was appropriate in the absence of a government effort to obtain the accused for trial.

The *McConahy* court said:

There is no reason not to apply the rule of *Smith v. Hooey* when the defendant is incarcerated by a foreign government rather than the United States or one of its states. . . . Unless there is a showing that an effort to have the defendant returned to this country for trial would be futile, the government must make such an effort. There has been no such showing here.

It is argued that neither bail jumping nor the offense for which McConahy was convicted in 1969 was an extraditable offense under the Extradition Treaty between the United States and Great Britain, which is in evidence, and that McConahy therefore could not be extradited. Assuming this is so, it is immaterial. There would have been no need to extradite McConahy, since he was not resisting extradition. On the contrary, as the government concedes, he was requesting that he be returned to the United States to answer the charges pending here. 505 F.2d at 773.

We are not persuaded. *Smith v. Hooey,* 1969, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607, held that upon demand of a person incarcerated in a federal penitentiary who is charged with a state crime, the charging state is required to make a diligent good faith effort to obtain the accused for trial on the pending state charge. In that case, Smith was a federal convict, imprisoned in a federal penitentiary at Leavenworth, Kansas. In 1960, he was indicted in Harris County, Texas, on a charge of theft. He repeatedly asked to be brought to trial. The state did nothing. In 1967, Smith moved to dismiss the state charge against him, but the state court did not act. Finally, Smith sought a writ of mandamus from the Texas Supreme Court to compel dismissal. The writ was denied, and Smith petitioned the Supreme Court for certiorari. The Texas court took the position that, because Texas could not compel the federal government to produce Smith for trial, Texas owed Smith no duty to try to obtain Smith's presence. Yet, as the Court pointed out, 393 U.S. at 380–381, 89 S.Ct. 575, Texas

conceded that, if it had tried to secure Smith's appearance, he would have been produced. The Court then ruled that, "In view of these realities, we think the Texas court was mistaken in allowing doctrinaire concepts of 'power' and 'authority' to submerge the practical demands of the constitutional right to a speedy trial." (393 U.S. at 381, 89 S.Ct. at 579). It went on to cite *Barber v. Page,* 1968, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255, which relied on "cooperation between the States themselves and between the States and the Federal Government" (390 U.S. at 723, 88 S.Ct. at 1321) in holding that a witness in an Oklahoma prosecution was not "unavailable" merely because he was in a federal prison located in Texas, when Oklahoma had made no effort to obtain his presence.

The kind of cooperation between the various sovereignties within the United States upon which the Court relied in *Smith* and *Barber* is long established. It is exemplified in the old case of *Ponzi v. Fessenden,* 1922, 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607, and is now provided for in numerous statutes. Extradition of a person charged with crime in one state and found in another state is provided for in Article IV, Section 2, paragraph 2 of the Constitution. Section 5 of the Uniform Criminal Extradition Act, 11 U.L.A. 59 (1974), adopted by 45 states, provides a mechanism for the temporary extradition of an accused incarcerated in one state to stand trial on charges in another state with no loss of jurisdiction over the accused by the original incarcerating state. *See, e. g., Morgan v. Horrall,* 9 Cir., 1949, 175 F.2d 404. The Interstate Agreement on Detainers, 11 U.L.A. 323 (1974), enacted by 48 states and the United States (18 U.S.C.App.; 84 Stat. 1397–1403) in Article V, contains a similar provision. Section 3182 of 18 U.S.C. provides an alternative mechanism for interstate extradition. Section 2241(c)(5) of 28 U.S.C. is a codification of the common law writs of *habeas corpus ad prosequendum* and *ad testificandum* issued when necessary to remove a prisoner in order to prosecute elsewhere or to obtain his appearance as a witness, and allows the transfer of federal

prisoners to face state charges. Section 4085(a) of 18 U.S.C., a codification of the holding in *Ponzi v. Fessenden, supra,* provides another mechanism for federal-state extradition.

█ There is no such framework of legislation, and no such long history of intergovernmental cooperation, in the field of international relations. Nation states are at least as jealous of their respective jurisdictions as were the states of the United States before the Civil War. And the states of the United States have no power to conduct the international relations of the United States. They are prohibited from entering into "any treaty, alliance, or confederation" by Article I, Section 10, paragraph 1 of the Constitution. The power to deal with foreign nations rests in the President, acting, in making treaties, by and with the advice and consent of the Senate (Article II, Section 2, paragraph 2 and Section 3 of the Constitution). The President conducts our foreign relations through the State Department, ambassadors and consuls, and others whom he appoints. The Attorney General and his employees, the United States Attorneys, and others enforcing the laws of the United States, including agents of the Drug Enforcement Administration, were not appointed to conduct negotiations with foreign nations.

The usual way in which a person charged with crime in the United States, but found in a foreign country, is transferred to the United States for trial is pursuant to an Extradition Treaty. Such a treaty exists between the United States and Peru (*see* 31 Stat. 1921, Treaty Series 288). However, the crimes with which Hooker was charged are not among those listed in Article II of the treaty. Consequently, the only way Hooker could have been brought to this country would have been by negotiating, on behalf of the United States, for his release to this country by the government of Peru. Normally, this would be done by the diplomatic agents of this country, dealing with those of Peru. Neither this court nor the district court is in any position to say whether, from the standpoint of this country's relations with Peru, it would have been wise or prudent to embark on such negotiations, or whether the Department of State should or would have done so. We do not think that it would be proper for us to adopt a rule, such as that announced in *United States v. McConahy, supra,* that would, in substance, require the Attorney General or his agents to embark on such negotiations, or require him to try to persuade the Department of State to do so.

So far as we know, no mechanism exists whereby Peru could have maintained jurisdiction over Hooker had he been released into United States custody. Had the government attempted to have Hooker returned to this country, an election would have been required between conviction by one sovereign and a potential conviction by another. The government would have had to ask Peru to commute its sentence, or at least to forego carrying it out, in order to have Hooker released to be brought to trial in the United States. The government would have had to make these entreaties in an international situation in which refusal would have been the equivalent of asking and receiving a rebuff. Similarly, had Peru agreed to allow Hooker to leave to stand trial in the United States, Peru would have had to request the United States to return Hooker to her after his trial, or resign herself to relinquishing all power over him. We do not think that the Court intended the rule in *Smith v. Hooey, supra,* to apply in this situation. Hooker found himself in prison in Peru because of his own voluntary acts in participating in a scheme to acquire cocaine in Peru and smuggle it into the United States. The time that he spent in Peru's prison is not to be counted in determining whether this country has denied him a speedy trial.

Our holding in this case is a recognition of "the exclusive competence of the Executive Branch in the field of foreign affairs." *First National City Bank v. Banco National de Cuba,* 1972, 406 U.S. 759, 761, 92 S.Ct. 1808, 1812, 32 L.Ed.2d 466. There, the Court also quoted Congressman John Marshall, as he then was: " 'The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations.' "

**290**

We agree with Judge Kaufman, writing for the Second Circuit in *United States v. Salzmann*, 2 Cir., 1976, 548 F.2d 395, where he says:

> Where the American right to demand extradition is established by treaty, considerations of foreign policy might well be subordinated to speedy trial. Where the United States must rely solely on comity, however, diplomatic factors may properly be taken into account in determining what diligence is due. We are unpersuaded that under these circumstances, the United States was obliged to seek Salzmann's return by means dehors the extradition treaty, and thus risk serious diplomatic embarrassment. P. 402.

In that case, the defendant was living in a foreign country, but had not violated its laws and was not imprisoned there. *A fortiori*, Judge Kaufman's remarks are apropos here.

Our holding makes it unnecessary for us to consider whether the trial court erred in its application of local rule Cr.R. 45(d) to the government's response to Hooker's motion to dismiss.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.