**UNITED STATES of America,
Plaintiff,**

v.

**Charles MCDONALD, Defendant.**

No. 1:86–CR–98.

United States District Court,
W.D. Michigan,
Southern Division.

Oct. 24, 2001.

Paul J. Denenfeld, Federal Public Defender, Grand Rapids, MI, for Charles McDonald.

Richard S. Murray, U.S. Attorney's Office, Western District of Michigan, Grand Rapids, MI, for U.S.

### OPINION

ENSLEN, District Judge.

"In delay there lies no plenty." William Shakespeare, *Twelfth Night.*

"He who awaits much can expect little." Gabriel Garcia Marquez.

### INTRODUCTION

Defendant Charles McDonald has been extradited to this Country by the Commonwealth of the Bahamas on the charge of conspiracy to possess with intent to distribute more than one kilogram of cocaine in violation of 21 U.S.C. § 846. Defendant, upon his appearance before this Court, has moved to dismiss the charge with prejudice on the ground that his right to a speedy trial under the Sixth Amendment to the United States Constitution has been violated. For the reasons which follow, the Motion will be granted.

### FACTS

Parties to this action have thoroughly briefed Defendant's Motion to Dismiss. While the affidavits and declarations filed by them seek to present somewhat different stories as to the diligence of the United States in seeking the extradition of the Defendant, a close reading of those affidavits and declarations show them to be complementary and not contradictory.

On September 16, 1986, Defendant was indicted by a grand jury of this District. On September 19, 1986, Magistrate Judge Karr issued an arrest warrant for the Defendant. Prior to the issuance of the warrant, by April or May 1996, the Defendant had returned to his native country, the Commonwealth of the Bahamas. (McDonald Declaration, at ¶ 2.)

Special Agent Mark S. Benston was assigned this investigation and has detailed his efforts over a fifteen year period to arrest the Defendant in the Bahamas. The following efforts by Benston, or agents working in connection with Benston, are detailed in Benston's Affidavit:

(1) On September 23, 1986, Defendant's arrest warrant was posted to the National Crime Information Center's records (Affidavit at ¶ 1);

(2) On September 24, 1986, Benston was advised by indicted co-defendants that the Defendant was either in Miami, Florida or the Bahamas (*Id.* at ¶ 2);

(3) On September 26, 1986, Benston requested assistance from the Miami Division of the Federal Bureau of Investigation in locating Defendant (*Id.* at ¶ 3);

(4) On November 21, 1986, Benston was advised by a DEA attache that the whereabouts of Defendant were unknown. Benston was also advised (presumably by the same DEA attache) that there was no possibility of a deportation of a Bahamian citizen (*Id.* at ¶ 5);

(5) On November 21, 1986, an INS Lookout Notice was placed by the INS requesting the arrest of Defendant at United States' border crossings (*Id.* at ¶ 6);

(6) In December 1986 and January 1987, both the Bahamian police and officials of the Miami Division of the F.B.I. contacted Benston to indicate that their efforts to find the Defendant were still ongoing (*Id.* at ¶¶ 7–8);

(7) On June 4, 1987, Drug Enforcement Agency Special Agent John Gartland, assigned to Nassau, contacted Benston to inform him that efforts at extradition were unlikely to be successful, that he was in contact with Defendant, and that there was some possibility of voluntary surrender (*Id.* at ¶ 9);

(8) Sometime after October 24, 1987, either Special Agent Gartland or DEA Special Agent Angela McCravy of Miami informed Benston that deportation was not a viable option as to a Bahamian citizen on drug charges, that Defendant had made statements to Garland on March 26, 1987, May 12, 1987 and October 24, 1987 relating to another criminal defendant, Fernando Pruna, and that the future cooperation of Defendant was still a possibility though he had declined to be debriefed at the United States' Embassy (*Id.* at ¶ 10);

(9) During 1988 and 1989, Benston was advised by sources that the Defendant was having legal problems (presumably criminal charges) with the Bahamian government and although he (Benston) advised the Bahamian Police of such, they failed to corroborate Defendant's presence (*Id.* at ¶ 11);

(10) On March 6, 1989, Benston contacted Assistant United States Attorney Richard Murray, who advised him that both unspecified officials in the Justice Department and the DEA felt that extradition was impossible (*Id.* at ¶ 12);

(11) On March 13, 1989, Gartland notified Benston that neither he (Gartland) nor Special Agent McCravy had further contact with the Defendant and that the United States was entering into a new extradition treaty with the Bahamas which might enable extradition (*Id.* at ¶ 14);

(12) On April 29, 1991, Benston was advised by the Bahamian Police that the Defendant had been located at his parents' home in the Bahamas on March 7, 1991 (*Id.* at ¶ 15);

(13) In June 1991, Benston contacted unspecified officials at the Department of Justice, who corroborated that the possibility of extradition had increased due to a new extradition treaty with the Bahamas (*Id.* at ¶ 16);

(14) Between July 8, 1991 and January 14, 1993, Benston assisted Assistant United States Attorney Richard Murray in preparing documents to request extradition, including affidavits of witnesses and identifying documents (fingerprints, photographs and driver's licenses) (*Id.* at ¶¶ 17–22);

(15) Sometime in 1994, Benston was asked by Murray to confirm the Defendant's recent location (during 1993–1994) (*Id.* at ¶ 23);

(16) Between May and July 1995, Benston corroborated to his satisfaction that the Defendant was residing with family members in the Bahamas by contacting Defendant's former attorney, his friends and family members and by subpoenaing telephone records of family members (*Id.* at ¶¶ 25–26);

(17) On November 6, 1995, Benston was advised by Murray that an extradition request had been forwarded by him to the Department of Justice for review (*Id.* at ¶ 27); and

(18) On December 1, 1995, extradition was formally requested (*Id.* at ¶ 28).

Additionally, the briefing of this matter discloses additional facts concerning the pertinent extradition treaties, local criminal charges against the Defendant, and Defendant's other conduct.

Prior to the Defendant's Indictment in this case, the United States and Great Britain entered into an extradition treaty, which governed extradition from the Bahamas. *See* Treaty of December 22, 1931, 47 Stat. 2122. On March 9, 1990, the United States signed an extradition treaty with the Commonwealth of the Bahamas for the purpose of improving extradition over the practices of the 1931 treaty. *See* Treaty of March 9, 1990, KAV 3171, Senate Treaty Doc. 102–17. The new treaty *explicitly* provided, unlike the prior treaty,

that citizenship is not a ground for refusing extradition. *Id.* at Art. 4. The new treaty became effective upon the exchange of ratification documents by the signatory countries, which occurred on September 22, 1994.

Although the prior treaty did not explicitly provide for the extradition of Bahamian citizens to the United States, the United States and the Commonwealth of the Bahamas exchanged diplomatic letters in 1978. As part of the exchange of letters in 1978, the Commonwealth of the Bahamas agreed to treat extradition requests as to its nationals on an equal basis with extradition requests of non-nationals. (Letter of March, 1978 of Paul L. Adderly, Minister of External Affairs, TIAS 9185; Defendants' Brief, Exhibit 13.) The prior 1931 Treaty also contained language governing extradition of persons with outstanding criminal charges in the Bahamas. According to the Treaty language, an extradition request is to be "deferred" pending the resolution of criminal charges or punishment in the extraditing country. (1931 Treaty, Article 4.) The 1931 Treaty also explicitly provided for the extradition of persons charged with "offenses or attempted crimes or offenses in connection with the traffic in dangerous drugs." (1931 Treaty, Article 3, ¶ 24.)

Also pertinent to this history are the history of two prosecutions against the Defendant in the Bahamas. The Bahamian courts reviewed this history when it considered the Defendant's petition for writ of habeas corpus-which challenged the extradition due in part to the pre-extradition delay by the United States. However, both the decision of the lower Bahamian court and the Bahamian Court of Appeals failed to precisely ascertain the length of time that criminal charges were pending against the Defendant in the Bahamas. Those decisions also appear to contain factual errors and are not worthy of deference, especially in light of the failure of the government to obtain supporting documentation relating to the Bahamian criminal prosecutions.

Defendant recounts the history of the Bahamian criminal charges as follows: He admits that he was charged by the Bahamian government beginning in 1988 (McDonald Declaration at ¶ 4); he states that the 1988 criminal charge of possessing property derived from drug proceeds was dismissed by the Bahamian government in 1992; he also admits that in 1991 he was charged with several counts of drug trafficking, which counts were dismissed by the Bahamian government in late 1994. (*Id.* at ¶¶ 5–6.)

Defendant in his Declaration and Exhibits also demonstrates that his whereabouts were easily verifiable in the Bahamas during his occupancy there. As of September 28, 1986, Agent Benston, according to FBI records, had received the Bahamian telephone numbers and addresses for Defendant's attorney, for Defendant's brother Ivan, and for Defendant's parents. (*See* Defendant's Brief, Exhibit 3.) Defendant relates that during 1987 and thereafter he had several contacts with Agent John Gartland and Bahamian customs officials on the subject of a separate criminal investigation by Gartland. (McDonald Decl. at ¶ 3.) The government was also advised in 1990 (according to records sent between Miami and Detroit DEA offices) that the Defendant was then working in a public and high profile job in the Bahamas-as the Assistant Manager of Coral World, a large aquarium exhibit. (Defendant's Brief, Exhibit 5.) During the pendency of the Bahamian criminal charges, 1988–1994, the Defendant regularly reported to the Bahamian Supreme Court and/or local police as a condition of his bail; his bail status and reporting requirements were regular-

ly published on the government radio broadcast system. (*Id.* at ¶¶ 4–5.) According to Defendant, he did not expressly know until 1996 that the government was seeking extradition as to formal criminal charges pending against him in the United States. (*Id.* at ¶ 7.)

Between May 12, 1995 and May 6, 1996, Defendant made several telephone calls to Agent Benston to give Benston his telephone number and contact information. (Defendants' Brief, Exhibits 7–11.) Defendant also called Assistant United States Attorney Richard Murray to request consideration of plea arrangements. (Defendant's Brief, Exhibits 10–11.) Murray did not consider plea arrangements because (according to Agent Benston's account of his conversation with Murray on April 29, 1996) "he did not want to jeopardize the extradition proceedings in the Bahamas." (Defendant's Brief, Exhibit 10.)

Defendant was arrested on the extradition request in the Bahamas in 1997 and was imprisoned for an eight-month period there before bail was granted. (McDonald Decl. at ¶ 7; United States' Brief at 10.) Because of the Defendant's challenge to the extradition which was premised in large part on the delay of the United States in seeking extradition, he was not extradited to the United States until June 2001. Thereafter, he appeared before the United States District Court for the Northern District of Florida on June 6, 2001, upon his arrival to the United States. He was then transferred to the Western District of Michigan and arraigned and detained on Count One of the Indictment. (The other charges against Defendant were later dismissed because the Commonwealth of the Bahamas granted extradition only as to Count One.[1])

This Motion was filed on August 23, 2001. The briefing was somewhat prolonged due to the United States' unsuccessful attempts to obtain official records from the Bahamian government relating to the Bahamian criminal charges. The Motion has now been fully briefed. Oral argument is unnecessary, especially in light of the need to promptly resolve the Motion.

### LEGAL STANDARDS

■ It goes without saying that our Constitution, the Sixth Amendment, guarantees criminal defendants the right to a speedy trial. This is a basic and fundamental right. Without it, our democracy would soon perish as those who would be despots would see the practical advantages of laying charges pending the trial perennially scheduled for tomorrow. Moreover, even within a country strongly committed to democratic values, the right to speedy trial is necessary to protect criminal defendants from dangers caused by oversight and negligence-such as excessive pre-trial incarceration, excessive anxiety and damage to reputation, and the loss of memory of both accusing and exculpatory witnesses.

■ The Sixth Amendment's speedy trial guarantee was trumpeted loudly by the United States Supreme Court in the case of *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), which announced the now familiar four-factor test inquiring into: (1) the length of delay between indictment and trial; (2) the reason for the delay; (3) the defendant's assertion of his right to speedy trial; and (4) the prejudice to the defendant caused by the delay.

This same four-factor case was more recently applied by the Supreme Court in

---

**1.** This dismissal was required as a matter of law under the Doctrine of Speciality. *See United States v. Rauscher,* 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886); *compare United States v. Andonian,* 29 F.3d 1432 (9th Cir. 1994).

*Doggett v. United States,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), a case in which the Supreme Court determined that the Sixth Amendment entitled the defendant to relief where there was an eight and one-half year delay between the charges and the defendant's arrest attributable to the negligence of the government. In so holding, it expressly recognized that lengthy delays are presumptively prejudicial to the Defendant even in the absence of proof of actual prejudice. It also recognized that delay attributable to government negligence, as opposed to bad faith, "falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution ... [and] the toleration of such negligence varies inversely with its protractedness ...." *Id.* at 657, 112 S.Ct. 2686.

### LEGAL ANALYSIS

■ In light of the pertinent legal standards, the legal analysis of this Motion is driven by the *Barker* factors, which are now duly considered based on the briefing of the parties. In considering the factors, the Court recognizes that no single factor is controlling, but rather the factors are to be balanced. *See Barker,* 407 U.S. at 529–30, 92 S.Ct. 2182.

### 1. Length of Delay

■ In this case, the delay is on the order of 15 years. Thus, the delay greatly exceeds the "one year" "presumptively prejudicial" time period identified in *Doggett* and thus mandates further inquiry into the remainder of the *Barker* factors. *See Doggett,* 505 U.S. at 652 n. 1, 112 S.Ct. 2686. Furthermore, this delay is also significantly greater than the eight and one-half year delay in *Doggett,* which the Supreme Court indicated was "extraordinary" and on the facts of that case warranted a conclusion of prejudice in the

absence of proof of actual prejudice. *See id.* at 652, 112 S.Ct. 2686.

### 2. Reasons for the Delay

■ As noted by the Sixth Circuit Court of Appeals in *United States v. Brown,* 169 F.3d 344, 349 (6th Cir.1999), *quoting United States v. Graham,* 128 F.3d 372, 374 (6th Cir.1997), "[b]ecause 'the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner ... the burden is on the prosecution to explain the cause of the delay.'" In this case, the government essentially provides two sets of explanations: the rationale of the investigating agent developed, presumably, at the time of the investigation; and the later rationale of the Assistant United States Attorney. According to the rationale of the investigator, the delay was caused by the government's legitimate difficulty in locating the Defendant and the legitimate concern that an extradition request under the 1931 Treaty would not have been successful. According to the rationale of the Assistant United States Attorney, the time periods of delay of September 19, 1986 to 1988, and July 1994 to December 1995 were caused by the difficulty in locating the Defendant; the time period of delay between 1988 and July 1994 were due to the outstanding criminal charges against the Defendant in the Bahamas; the time period of delay between the latter part of 1995 and the extradition were due to the Defendant's challenges to extradition and the delay of the Bahamian authorities in making his arrest. While the Court will analyze all of these rationales, it does not escape this Court's attention that the multiplicity of the explanations, especially those which are inconsistent, detract from the government's effort to meet its burden of proof.

Relating to the issue of whether difficulty in locating the Defendant caused the

delay, the Court finds from the record facts that the delay in locating the Defendant was due to the negligence of the government. The essential information which the government needed to locate the Defendant was known to the government in 1986, which is proven by the fact that the use of this same information in 1995 led to the Defendant's quick location in 1995. The government also actually located the Defendant in 1987 and 1991, but failed to extradite him at the time. Similar to the events in *Doggett*, this was a case wherein

> "the Government's investigators made no serious effort [to find the defendant] ... and, had they done so, they could have found him within minutes. While the Government's lethargy may have reflected no more than [the defendant's] relative unimportance in the world of drug trafficking, it was still findable negligence ...."

*Doggett*, 505 U.S. at 652–53, 112 S.Ct. 2686.

Relating to the rationale that it was proper for the government to delay an extradition request because of its perceived difficulty in obtaining extradition and because the government is entitled to use its foreign policy judgment as to whether to lodge an extradition request, this rationale cannot stand on the facts of this case. It is rejected for three separate reasons.

First of all, as noted above, the signing of the new extradition treaty did not make any changes in the official treaty law which had any impact upon the ability of the United States to seek extradition. Both before and after the change in the treaty, the Defendant was subject to extradition to the United States for his crimes, regardless of his nationality.

Second, the exercise of foreign policy judgment as to extradition does not excuse the prompt making of an extradition request under the facts of this case. The doctrine on which the United States attempts to rely was perhaps best explained by the Ninth Circuit Court of Appeals in the case of *United States v. Hooker*, 607 F.2d 286, 289 (9th Cir.1979), where it was said:

> We agree with Judge Kaufman, writing for the Second Circuit in *United States v. Salzmann*, 2 Cir., 1976, 548 F.2d 395, where he says:
>
>> Where the American right to demand extradition is established by treaty, considerations of foreign policy might well be subordinated to speedy trial. Where the United States must rely solely on comity, however, diplomatic factors may properly be taken into account in determining what diligence is due....

*Hooker*, 607 F.2d at 290. In this case, a foreign treaty was in place which allowed for the extradition and there were no considerations such as comity or the involvement of a foreign governmental official which required the exercise of significant foreign policy judgment.

■ Third, even in cases where the defendant is imprisoned in a foreign treaty country which might elect to defer extradition, the failure to seek extradition is delay which is attributable to the government. *United States v. McConahy*, 505 F.2d 770 (7th Cir.1974) (holding that in the absence of an attempt to seek extradition of the defendant, who was incarcerated in Britain, the delay in his trial was attributable to the government); *United States v. Pomeroy*, 822 F.2d 718 (8th Cir.1987) (holding that failure to seek extradition from Canada of defendant incarcerated there was attributable to the government); *compare United States v. Blanco*, 861 F.2d 773 (2d Cir.1988) (holding that government was under no obligation to seek extradition of defendant in foreign country when ex-

tradition was a matter of comity); *United States v. Diacolios*, 837 F.2d 79 (2d Cir. 1988) (same); *United States v. Woods*, 851 F.Supp. 1564 (S.D.Fla.1994) (not attributing delay where defendant was an *official* of the Bahamian government).

■ While it is true that the Bahamian government might have elected to defer extradition pending resolution of the local charges, it is equally possible that they might have elected to dismiss their charges and extradite the Defendant immediately. Because we will now never know with certainty what would have happened had the United States acted promptly, the above case law properly strikes the balance in favor of the Defendant's speedy trial rights by attributing the delay to the government. This is also a wise policy from the perspective that even in cases where deferral occurs there· is no reason to impose further delays in the extradition process (*i.e.,* locating the defendant after dismissal of local criminal charges) which would be otherwise avoidable by an earlier extradition request. Overall, the case law strikes the proper balance in determining that when ˙the United States sleeps on its rights under a formal extradition treaty, the delay in seeking the extradition is attributable only to the government regardless of the pendency of local criminal charges.

Relating to the rationale that the delay associated with the extradition contest should not be attributed to the government, this argument is weak for several reasons. First and foremost, almost a decade had passed even before the extradition request made its way overseas. Thus, even if the delay attributable to the extradition contest is not attributable to the government, the greatest part of the delay in this case predated the extradition contest and is attributable to the government. Second, none of the various cases cited by the government consider an extradition

contest premised on pre-extradition delay caused by the government. This kind of extradition challenge parallels the Defendant's assertion of his rights to a speedy trial and is consistent, and not inconsistent, with the notion that the Defendant through his conduct was seeking to protect his right to a speedy trial. Thus, the Court finds that, under the unusual facts of this case, the delay in the extradition contest should be attributable to the government because it was caused by the lengthy and unjustified delay in seeking extradition.

For the reasons stated above, the Court determines the delay of trial is attributable to the negligence of the government in not promptly seeking extradition.

### 3. Timely Assertion of Right to Speedy Trial

■ The Defendant asserts that he has promptly asserted his right to speedy trial by the prompt filing of his speedy trial motion in this case. *See Wilson v. Mitchell*, 250 F.3d 388, 396 (6th Cir.2001). The United States contests this notion because: (1) Defendant knew about the charges in 1987 when he had a conversation with Agent Benston about the charges; (2) he did not voluntarily return to the United States in 1987 to assert his right to a speedy trial and he did not voluntarily meet with authorities at the United States embassy; and (3) he filed an extradition contest.

On the whole of the record, the Court finds that the Defendant in fact timely asserted his right to a speedy trial. The Defendant timely asserted his right to speedy trial by motion soon after being arraigned on the charges in the United States. Furthermore, Defendant's pre-arraignment conduct does not detract from the Court's conclusion that he timely asserted his right to a speedy trial. The

Defendant in this case never fled the United States to escape arrest. He never secreted himself in the Bahamas to escape extradition. The conversations the Defendant had with agents through the years in the Bahamas were, at worst, ambiguous and did not constitute an explicit refusal to voluntarily surrender. Indeed, the government has, conveniently, overlooked that the Defendant at times voluntarily contacted the government to express his desire to negotiate his return to the United States and on more than one occasion gave investigators the impression that he was open to voluntary surrender. While the filing of an extradition contest in some cases may constitute a waiver of speedy trial, in this case the opposite conclusion is warranted. First, there was an extensive and unnecessary pre-extradition request delay which was solely attributable to the government. Second, the grounds for the extradition challenge included the extensive, pre-extradition delay caused by the government and the challenge was motivated by the Defendant's interests in speedy trial.

Accordingly, the Court concludes that the Defendant promptly expressed his right to a speedy trial.

### 4. Prejudice

■ Defendant in his briefing has given one example of actual prejudice-*i.e.*, he is unable to even locate for interview and potential testimony Celestino Mendez, the person who was the alleged ringleader of this conspiracy. According to Defendant, Mendez was placed sometime ago in the federal witness protection program and efforts to contact him have been futile. The record does not disclose whether the United States has any ability to contact Mendez nor does it disclose what his potential testimony might be.

While it is unclear that the possible loss of Celestino Mendez's testimony has prejudiced the Defendant, this Court is quite certain that the delay has overall prejudiced the Defendant. The Defendant does have a constitutional interest in not having his name in official and public disrepute for a fifteen-year-period. Furthermore, he has a strong and compelling interest in having his criminal matter tried before trial witnesses have lost all inkling of the criminal involvement of any conspiracy members. This Court has had long and extensive experience in criminal drug conspiracies. This kind of drug conspiracy case typically depends on the testimony of witnesses who recount what conspiracy members did or did not do, or what conspiracy members did or did not say on specific occasions. The likelihood that these witnesses now recall their pertinent testimonies in a manner which could assist the Defendant in his defense is extremely doubtful, if not essentially nil. This is especially true as it relates to the pertinent testimony of innocent bystanders, who might have been able to recall details which could corroborate or contradict the testimony of government witnesses had this case been tried years ago. Now, the dimming recollection of prosecution witnesses is not likely to be specific enough to be tested in cross-examination and the dimming recollection of innocent bystanders are likely to make them simply unavailable for testimony.

In the *Doggett* case, the Supreme Court determined that the eight and one-half year delay in prosecuting that case was "extraordinary" and entitled the Defendant to an inference of prejudice in the absence of proof of actual prejudice, because the proceedings had delayed so long that the presence or absence of actual prejudice could be proven by neither party. *Doggett,* 505 U.S. at 655, 112 S.Ct. 2686. In this case, the inference is far stronger due to the extreme and extraordinary delay in this case. The Court determines that the delay caused by the govern-

ment makes the likelihood of a fair trial now nearly impossible and the public confidence which could be afforded to any conviction non-existent.

Therefore, the Court concludes that Defendant has been prejudiced by the delay. Since all of the *Barker* factors favor the defense, the Court concludes that the Motion will be granted and the instant Indictment against the Defendant dismissed with prejudice.

### CONCLUSION

Consistent with this Opinion, Judgment shall enter granting Defendant's Motion to Dismiss and dismissing this action with prejudice.